IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

NEWBERG BUSINESS CENTER, LLC,    )
                                  )
            Plaintiff,            )    TC-MD 130261N
                                  )
      v.                          )
                                  )
YAMHILL COUNTY ASSESSOR,          )
                                  )
            Defendant.            )    **FINAL DECISION**

The court entered its Decision in the above-entitled matter on February 28, 2014.  The court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days after its Decision was entered.  The court's Final Decision incorporates its Decision without change.

Plaintiff appeals the real market value of property identified as Account 535288 (subject property) for the 2012-13 tax year.  A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on January 6, 2014.  W. Scott Phinney, Plaintiff's authorized representative, appeared on behalf of Plaintiff.  Edmund Bartholemy (Bartholemy), Plaintiff's owner, and Rick Bean (Bean), licensed real estate broker, testified on behalf of Plaintiff.  Christopher Lanegan (Lanegan), Registered Appraiser III, appeared on behalf of Defendant.  The court allowed Lanegan's testimony over Plaintiff's objection to his qualification as an expert witness because Lanegan is a Registered Appraiser.

Plaintiff's Exhibits 1, 3, 4, and 5 and Plaintiff's Rebuttal Exhibits 6 and 7 were received without objection.  Defendant objected to Plaintiff's Exhibit 2, an appraisal of the subject property prepared by Rick V. May as of April 19, 2011.  The court excluded Plaintiff's Exhibit 2 because the author of the report was not available to testify.  Defendant objected to, and the court

excluded, Plaintiff's Trial Memorandum because it included factual assertions and opinions that were not part of the testimony and evidence presented by Plaintiff.

Defendant's Exhibits A and C were received without objection. The court admitted Defendant's Exhibit B, Lanegan's appraisal report, over Plaintiff's objections. Plaintiff argued that Lanegan's appraisal report did not satisfy the requirements of a "summary appraisal," but failed to cite any authority in support of that objection. Plaintiff argued that Lanegan's appraisal report included insufficient supporting evidence. The court ruled that Plaintiff's objection would be considered in weighing the appraisal report. Plaintiff objected to Defendant's Exhibit D, the listing of the subject property, because the listing broker, Ryan Imbrie (Imbrie), was not available to testify at trial. Plaintiff provided an exhibit authored by Imbrie, a letter conveying Imbrie's opinion that the subject property's listing price was too high. (Ptf's Ex 3.) The court admitted Defendant's Exhibit D because the listing was a publically available document. The court admitted the first two pages of Defendant's Rebuttal Exhibit E. Plaintiff objected to, and the court excluded, the third and fourth pages of Defendant's Rebuttal Exhibit E, an email that included an inconclusive statement in response to a sale verification request.

## I. STATEMENT OF FACTS

The subject property is 7,200 square-foot metal frame building "with sheet metal exterior and roof and concrete flooring" that was built in 2009. (Def's Ex B at 5, 26.) It is divided into four units that may be rented separately. (*See id.* at 20-21.) The subject property is situated on a 0.68-acre parcel in the Airport Industrial Overlay (AIO) zone in Newberg, Oregon, "and is accessed from an urban two-lane improved street and has deeded easement access to Sportsman Airport airstrip." (*Id.* at 5, 26.) "Sportsman Airpark is a privately owned, public use general aviation airport." (*Id.* at 12.) According to the Newberg zoning code, "[t]he purpose of the City

of Newberg AI airport industrial district is to encourage and support the continued operation and vitality of Sportsman Airpark by allowing airport-related industrial uses * * *." (*Id.* at 14.) The [AIO] subdistrict serves a similar purpose. (*Id.* at 13.)

Bartholemy testified that, as of January 1, 2012, and at the time of sale, the subject property had one bathroom and each unit had a small electric heater for "freeze protection." Lanegan inspected the subject property in October 2013 and provided the following description of the subject property's interior: "the building is finished with sheetrock, open I-beams, suspended electrical heaters, minimal electrical outlets, rough-in plumbing (all located near the center of the building where the [four] units meet), finished concrete flooring, [one] man door and at least one over-head rolling door except for unit [D] which has a bi-fold electrical door for airplane access." (Def's Ex B at 20.)

As of the date of Lanegan's October 2013 inspection, the subject property's four units were occupied. (*See* Def's Ex B at 20-21.) "Unit A [was] occupied by a tenant for storage of business papers, automotive vehicles, and other personal property." (*Id.* at 20.) "Unit B [was] occupied by tenant (Chehalem Valley Auto Repair) for the use of an automotive repair business." (*Id.*) Lanegan testified that units C and D were occupied by Aerowelding & Fab, LLC, which uses the units "primarily for airplane repair and fabrication * * *." (*See id.* at 21.) Bartholemy testified that the subject property's leases were all full service.

A.    *Sale of the subject property*

Bartholemy testified that he has 20 years experience in commercial real estate and that he and his business partners own several properties located near the subject property. He testified that he sold the subject property when it was vacant land in 2007 to its prior owner and that he was involved with the "airport designation" of the subject property land. (*See* Def's Ex B at 20

(subject property land sold for $164,000 in February 2007).) Bartholemy testified that he first learned the subject property was for sale at a "CCIM [Certified Commercial Investment Member] marketing session." (*See* Ptf's Ex 3.) He testified he was interested in buying the subject property because it provides access to a property that he owns to the north of the subject property.

The subject property was initially listed for $365,000 in November 2011 and marketed as a bank-owned property. (Ptf's Ex 1 at 16, Ex 3; Def's Ex D.) Bartholemy testified that Imbrie, a real estate broker, handled the sale of the subject property on behalf of the seller, Riverview Community Bank. (*See* Ptf's Ex 1 at 2, Ex 3.) Bean testified that he discussed the subject property sale with Imbrie and that conversation is reflected in Imbrie's letter. (*See* Ptf's Ex 3.) Imbrie reported that the seller received an offer of $250,000 that it rejected; the seller was contacted by other investors considering offers in the range of $200,000 to $250,000. (*Id.*) Bartholemy testified that he was not willing to pay $365,000 for the subject property because the tenant income did not support that price. Bartholemy testified that he offered $300,000, but let his offer lapse after he discovered that one tenant had not paid rent in nine months and another was going to declare bankruptcy. (*See id.*) Imbrie stated "the bank decided to re-engage with [Bartholemy] at a price of $280,000 on March 9[, 2012,] as long as he committed to closing by the end of the month." (*Id.*) Plaintiff purchased the subject property for $280,000, or $38.89 per square-foot, in March 2012. (Ptf's Ex 1 at 2.)

B.      *Subject property market*

Bean and Lanegan disagreed whether Newberg is part of the Portland metropolitan area. Bean testified that Portland is a "primary" market; Salem is a "secondary" market; and Newberg is a "tertiary" market. Lanegan reported that Newberg is located "approximately 24 miles

southwest of downtown Portland" and "approximately 29 miles from downtown Salem * * *."
(Def's Ex B at 11.)  He determined that "[t]he subject property market area is located within the
Portland Metropolitan Economic Region." (*Id.* at 8.)  Plaintiff provided rebuttal exhibits
indicating that Norris, Beggs, & Simpson does not include any part of Yamhill County in its
Portland metropolitan area retail submarkets.  (Ptf's Rebuttal Exs 6, 7.)

Bean provided a graph of asking prices for industrial property in Newberg from 2006
through 2013, indicating a price of about $70 per square-foot as of January 2012.  (Ptf's Ex 5 at
1.)  Lanegan summarized a CoStar "study of industrial sales in the Portland Metropolitan Area"
that showed a decline in the median price from $71.90 to $66.50 per square-foot and a decline in
the average price from $57.93 to $50.23 per square-foot.  (Def's Ex B at 9.)  Lanegan reported
that, according to "a study of industrial sales in the Portland Metropolitan [area,]" average days
on the market were 503 and median days on the market were 389 from January 1, 2011, through
January 1, 2012.[1]  (*Id.* at 10.)

C.      *Sales Comparison Approach*

Bean testified that his "mission" was to determine if the market evidence supported the
subject property's sale price.  He testified that, based on the sales he reviewed, the sale of the
subject property was not at odds with Newberg area market evidence.  Bean testified that he did
not verify any of the sales he presented, nor did he make any adjustments to the sales.  (*See* Ptf's
Ex 5.)  To explain how he compared the subject property to other sales, Bean testified that the
subject property is superior to a pole barn or shed, but inferior to an office or retail space.

Bean reviewed several sales of properties in Newberg and one in Sheridan, Oregon.  (*See
generally* Ptf's Ex 5.)  One of the properties presented by Bean sold for less than the subject

---

[1] The sales presented by Bean had been on the market from 37 to 491 days and the sales presented by
Lanegan had been on the market from 0 to 522 days.  (Ptf's Ex 5 at 2-7; Def's Ex B at 29-33.)

property. That property was an 8,000 square-foot warehouse in Sheridan, Oregon, that sold for $27.50 per square-foot in February 2013. (*Id.* at 2.) Bean testified that the property was of lower quality than the subject property. On rebuttal, Defendant presented a Regional Multiple Listing Service print-out for the property located in Sheridan indicating that the February 2013 "sale" was a lease option. (Def's Rebuttal Ex E at 1-2.)

Bean's remaining property sales ranged from $40.83 to $100 per square-foot. (*See* Ptf's Ex 5 at 3-7.) A 2,714 square-foot industrial property with "useable warehouse" located in Newberg sold for $73.69 per square-foot in June 2013. (*Id.* at 3.) A 6,000 square-foot office building with "retail on ground floor off lobby" located in Newberg sold for $40.83 per square-foot in February 2012. (*Id.* at 4.) A 9,500 square-foot "retail building in the center of downtown Newberg" sold for $84.74 per square-foot in December 2013. (*Id.* at 5.) A 7,000 square-foot "[r]estaurant property with equipment and fixtures" located in Newberg sold for $100 per square-foot in April 2013. (*Id.* at 6.) A 19,628 square-foot office building located in Newberg sold for $63.68 per square-foot in March 2012. (*Id.* at 7.)

Lanegan presented five "sales of industrial properties of the same general character as the subject [property] in the Newberg area." (Def's Ex B at 24.) Lanegan gave the most weight to his sale 1 "due to its proximity, same zoning, and similar use to the subject [property]." (*Id.*) Sale 1 was an 8,877 square-foot property located on the same street as the subject property and in the AI zone that sold for $55.76 per square-foot in May 2012. (*Id.* at 26.) Lanegan testified that sale 1 was a two-story building with office build-out, although he did not know the size of the office build-out. He testified that it included heat, air conditioning, and three bathrooms. Sale 1 was a bank-owned property that sold "after a foreclosure." (Def's Ex B at 29.) Bartholemy testified that he had knowledge of Lanegan's sale 1 and described it as "very extravagant."

Lanegan characterized his sales 3 and 5 as similar to the subject property, although he wrote that sale 5 "set the higher end of the market." (Def's Ex B at 24-25.) Sale 3 was an 11,200 square-foot property located in the C2 zone in Cornelius, Oregon, that had been used as a "tool retail store" and sold for $44.64 per square-foot in October 2013. (Def's Ex B at 26, 31.) Lanegan testified that he considered Cornelius to be a similar market to Newberg based on the population and proximity to Portland. Sale 5 was a 3,000 square-foot office building located in the M2 "light industrial zone" 0.50 miles from the subject property in Newberg that sold for $75.00 per square-foot in April 2012. (Def's Ex B at 26, 33.) Lanegan determined sale 2, which sold for a time-adjusted price of $102.56 per square-foot and sale 4, which sold for $79.68 per square-foot, were superior to the subject property. (*See id.* at 26.) He concluded a price of $55 per square-foot for the subject property. (*Id.*)

D.    *Income Approach*

Lanegan provided a listing of the subject property that reported "scheduled income" of $45,600 based on actual rents of $6.00 per square-foot, or $10,800 total, for unit A; $9.00 per square-foot, or $16,200 total, for unit B; $5.00 per square-foot, or $9,000 total, for unit C; and $5.33 per square-foot, or $9,600 total, for unit D.[2] (Def's Ex D at 7, 9.) The listing reported expenses of $1.96 per square-foot, or $14,093, including "projected taxes" of $9,393. (*Id.* at 7.)

Bean provided several lease listings of industrial properties in Newberg. (Ptf's Ex 4 at 5-11.) The asking rents reported for "modified gross" or "industrial gross" ranged from $9.31 to $11.82 per square-foot for space ranging from 1,000 to 3,545 square feet in a property built in 2009. (*Id.* at 5.) The asking rents for triple net were $6.60 per square-foot for a 3,400 square-foot retail building; $9 per square-foot for a 3,200 square-foot building; and $5.40 per square-

_____

[2] At the time of the subject property listing, unit D was occupied by G-Limos, LLC, with a lease end date of February 2013. (Def's Ex D at 9.)

foot for a 28,690 square-foot industrial flex property built in 2008. (*Id.* at 5, 7, 9.) In his full service pro forma, Bean used rent of $7.50 per square-foot for "shell" and $8.50 per square-foot for "office/bath" and concluded potential gross income of $55,800. (*Id.* at 1.)

Bean provided a RealtyRates.com Market Survey for the first quarter of 2012 for "Far West – Class A & B Industrial Buildings" that reported vacancy of 6.6 percent, an expense ratio of 39.05 percent, and an "OAR" of 9.3 percent for warehouses.[3] (Ptf's Ex 4 at 4.) Bean testified that he used a vacancy rate of 10 percent because that was typical for the area. Bean used expenses of 36 percent, or $2.51 per square-foot. (*Id.* at 1.) He testified that he used lower expenses than indicated by the RealtyRates survey because the subject property does not have many amenities. Bean subtracted an additional three percent for reserves. (*Id.*) He used a capitalization rate of 9.30 percent to which he added a tax rate of 1.50 percent for an overall rate of 10.80 percent. (*Id.*) Bean concluded an indicated value of $284,000, rounded. (*Id.*)

Lanegan testified that Plaintiff provided the subject property's leases and he relied, in part, on those in his income approach. (*See* Def's Ex B at 34, 37.) He concluded potential gross income of $43,440. (*Id.* at 37.) Lanegan determined that the "rental comparable[s] from Newberg suggest[ed] a [vacancy] range from 12.5 to 16 percent with an average of 15 percent[,]" and he selected 14 percent for the subject property. (*Id.* at 34.) Lanegan stated that he did not receive actual expenses from Plaintiff, so he relied on data for the "Portland area" from the "Building Owners and Managers Association (BOMA)" for expenses. (*Id.* at 35.) He subtracted management expenses of eight percent and other expenses of eight percent. (*Id.* at 37.) Lanegan used a capitalization rate of eight percent based on "market sales with corroboration from market surveys" for an indicated value of $392,263. (*Id.* at 36, 37.)

---

[3] Bean testified that the subject property was more similar to warehouse than to "Flex R&D." (*See* Ptf's Ex 4 at 4.)

Plaintiff questioned Lanegan about the expenses he used in his income approach. Lanegan testified that he thought the subject property leases were triple net. He testified that expenses are higher for full service leases than for triple net and acknowledged that he should have added the tax rate to the capitalization rate.

E.      *Cost Approach*

Bean testified that he did not use the cost approach. Lanegan used the cost approach and relied on Marshall & Swift to determine a cost new for the subject property. (Def's Ex B at 42.) He testified that he determined a depreciation rate of 13.3 percent based on straight line depreciation and a useful life of 40 years. (*See id.* at 38, 42.) Lanegan testified that he determined a land value of $75,000 for the subject property based on sales of vacant, industrial land, although he did not include any of the land sales in his report. (*See id.* at 42.) He concluded a total indicated value of $424,873 under the cost approach. (*Id.*) During cross examination, Lanegan testified that he failed to subtract depreciation from some items and his indicated value should be less than the value stated in his appraisal report.

F.      *Tax roll and requested real market values*

The subject property's 2012-13 tax and assessment roll real market value was $735,300. (Ptf's Compl at 2.) The board of property tax appeals reduced that value to $620,000. (*Id.*) The 2012-13 maximum assessed value was $568,697. (*Id.*) Plaintiff requests a 2012-13 real market value of $280,000 based on the sale of the subject property in March 2012. (*Id.* at 1.) Defendant requests a 2012-13 real market value of $402,000 based on Lanegan's appraisal. (Def's Ex A at 2.)

/ / /

/ / /

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2012-13 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1),[4] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2). The three approaches of value that must be considered under the applicative administrative rule are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308.205-(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.*

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.* (*Poddar*), 18 OTR 324, 332 (2005) (citation omitted). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet [its] burden of proof." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.    *Sale of the subject property*

"A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sale price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev. (Kem),* 267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted).

Under *Kem*, a sale of the subject property must be recent. 267 Or at 114. Plaintiff's purchase of the subject property in March 2012 was recent as of the January 1, 2012, assessment date. The next question is whether Plaintiff's purchase was a "voluntary, arm's length transaction * * *." *Id.* The subject property was a bank-owned property at the time of sale. This court has previously observed that:

> "There are many practical reasons why the sale of a property following foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value. For example, the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth, particularly if it would take a few months more to find a buyer willing to pay a higher price. If so, the sale, at best, likely represents the low end of the real market value range, and may have been well below the actual market value of the property."

*Kryl v. Lane County Assessor (Kryl)*, TC-MD No 100192B, WL 1197444 at *2 (Mar 30, 2011).

In *Kryl*, this court gave little weight to a bank-owned property sale which occurred within a few months after the bank acquired it and after a short listing period. This court has also observed that, "a sale of bank-owned property conducted with such rapidity suggests duress or compulsion on the part of the seller, leading the court to conclude such sales are not indicative of

an arm's-length transaction." *Brashnyk v. Lane County Assessor (Brashnyk)*, TC-MD 110308, WL 6182028 at *5 (Dec 12, 2011). However, the Oregon Supreme Court has recognized that property purchased through foreclosure may be considered "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward v. Dept. of Revenue*, 293 Or 506, 508, 650 P2d 923 (1982). This court has also held that "[t]here are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk*, WL 6182028 at *5.

The subject property listing began in November 2011 and the subject property sold in March 2012, indicating it was on the market between 120 and 150 days. That is less than both the average 503 days and median 389 days on the market for industrial properties that sold in the Portland metropolitan area, which Bean testified was a superior market to Newberg. Other evidence suggests that the bank was eager to quickly sell the subject property, such as its acceptance of Plaintiff's offer of $280,000 conditioned upon closing by the end of the month. Some evidence supports a finding that the sale of the subject property was a voluntary, arm's length transaction indicative of its real market value. The subject property was listed and actively marketed by a real estate broker. Imbrie's letter reported that the bank received at least one offer that it rejected and engaged in some negotiations over the price.

The Oregon Supreme Court in *Ernst Brothers Corp. v. Dept. of Rev.* stated,

"In the absence of data indicating that 'the price paid was out of line with other market data material, we believe [a recent sale] to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive.' "

320 Or 294, 300, 882 P2d 591 (1994) (citations omitted). Bean testified that he reviewed "other market data" and concluded that the sale of the subject property was not out of line with the market. The court disagrees. The subject property sold for $38.39 per square-foot, which is less

than any of the sales presented by Bean and Lanegan, with the exception of Bean's sale in Sheridan that was a lease option. The court is not persuaded that the subject property's sale price alone is sufficient evidence of its real market value as of January 1, 2012, and looks to other evidence of real market value considering the three approaches of value.

B.      *Sales comparison approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson,* WL 21263620 at *3. "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used." OAR 150-308.205-(A)(2)(c).

The sales presented by Bean, including a restaurant, retail space, and offices, were not comparable to the subject property and Bean did not make any adjustments or otherwise analyze the sales in a sales comparison grid format. Bean did not verify any of the sales he presented. Bean failed to present any reliable evidence of comparable sales. Lanegan's comparable properties were, overall, more comparable to the subject property than Bean's and Lanegan made some qualitative analysis of differences between the subject property and his comparable properties. Lanegan placed the most weight on sale 1 given its proximity to the subject property and location in the same AI zone. Lanegan's sale 1 included some office build-out and superior amenities to the subject property. As a result, Lanegan's conclusion of $55 per square-foot for the subject property under the sales comparison approach is slightly overstated.

/ / /

The court finds that less weight should be given to sales comparison approach because the evidence of comparable sales was very limited and neither Bean nor Lanegan made reasonable adjustments to their sales.

C.      *Income Approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen v. Dept. of Rev.* (*Allen*), 17 OTR 248, 253 (2003) (citation omitted). "A basic requirement of the income method is fixing an annual income to capitalize." *Pacific Power & Light Co. v. Dept. of Revenue* (*Pacific Power*), 286 Or 529, 540, 596 P2d 912 (1979). The Oregon Supreme Court "decided that the flow of income to be determined is that which 'would be anticipated by reasonable, knowledgeable buyers and sellers as of the assessment date[.]'" *Pacific Power*, 286 Or at 541-42, citing *Mt. Bachelor v. Dept. of Rev.*, 273 Or 86, 539 P2d 653 (1975). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income[.]" *Allen*, 17 OTR at 253. Net operating income "is the currently expected net income of a property after all operating expenses are deducted from gross income." *Id.* at 254. "To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.*

Lanegan concluded that the subject property leases reflected market rates and no evidence was presented to suggest otherwise. The lease rates were included in the subject property's listing available to potential buyers. The court accepts that potential gross income was $45,600 based on the subject property's actual rents. The court accepts Bean's vacancy rate of 10 percent, which is supported by the limited evidence of vacancy rates provided by Bean and Lanegan, and determines effective gross income of $41,040.

Neither Bean nor Lanegan adequately supported their expenses and Lanegan mistakenly thought that the subject property leases were triple net. The subject property listing reported expenses of $4,700, not including "projected taxes." The court finds expenses of $4,700 and reserves of three percent, or $1,231 rounded, for net operating income of $35,109. Bean failed to provide evidence supporting his capitalization rate of 10.80 percent. The court accepts Lanegan's capitalization rate of eight percent. Lanegan testified that he should have added the property tax rate to his capitalization rate, but failed to do so. The court adds the 1.5 percent property tax rate used by Bean for an overall rate of 9.5 percent. The income approach indicates a value of $370,000, or $51.39 per square-foot, for the subject property as of January 1, 2012.

The court finds that most weight should be given to the income approach because the subject property is an income producing property.

D.      *Cost approach*

"In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006) (citations omitted). The cost approach is "particularly useful in valuing new or nearly new improvements[,]" but is "less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." *Id.*

Only Lanegan utilized the cost approach. The court gives little weight to Lanegan's determination of a real market value of $424,873 under the cost approach because he failed to provide any supporting evidence and he made errors in his depreciation calculation, the net effect of which was an overstated real market value using the cost approach.

/ / /

E.      *Reconciliation*

Plaintiff failed to carry its burden of proof that the subject property's real market value was $280,000 as of January 1, 2012. Plaintiff spent considerable time during trial highlighting the deficiencies in Lanegan's appraisal report and Plaintiff failed to present its own competent evidence of real market value. Plaintiff criticized Lanegan's highest and best use analysis, yet failed to present its own highest and best use analysis. Plaintiff argued that Bean should be held to a lower standard than Lanegan because Bean's only task was to confirm that the subject property's sale price was in line with the market. The court disagrees, noting that the issue before the court is the subject property's real market value as of January 1, 2012, and that Plaintiff bears the burden of proof. This court has stated many times that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar*, 18 OTR at 332 (citation omitted).

This court has jurisdiction to determine the real market value based on the evidence presented. The parties agree that the 2012-13 tax roll real market value of the subject property is in error and should be reduced, but disagree as to the magnitude of the reduction. The subject property is an income producing property and the court found that the income approach should be given the most weight. Based on the evidence presented, the court found that the income approach indicated a real market value of $370,000 for the subject property as of January 1, 2012.

III.  CONCLUSION

After careful consideration, the court concludes that the real market value of the subject property was $370,000 as of January 1, 2012. Now, therefore,

/ / /

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account 535288 was $370,000 for the 2012-13 tax year.

Dated this ____ day of March 2014.

_____
ALLISON R. BOOMER
MAGISTRATE

***If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your Complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.***

***This document was signed by Magistrate Allison R. Boomer on March 17, 2014. The court filed and entered this document on March 17, 2014.***